FILED
United States Court of Appeals
Tenth Circuit

September 21, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

MANUEL A. ROACH,

Defendant–Appellant.

No. 08-3029

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:07-CR-10103-WEB-1)**

---

Peter John Orsi, II, Wichita, Kansas, for Defendant–Appellant.

Donald Christopher Oakley, Special Assistant United States Attorney (Marietta Parker, Acting United States Attorney, with him on the briefs) Office of the United States Attorney, Wichita, Kansas, for Plaintiff–Appellee.

---

Before **LUCERO**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Manuel A. Roach was a long-time member of the Northside Crips, a

Wichita, Kansas, street gang. Years after his last documented involvement in a

gang-related criminal incident and more than a year after he acknowledged living

a gang "lifestyle," police obtained and executed a search warrant for his girlfriend's residence. During the search, officers found a firearm, ammunition, and a bag of crack cocaine. At Roach's subsequent trial, a police detective was allowed to testify as an expert on gang culture. A jury convicted Roach of five counts arising from possession of the firearm, ammunition, and drugs.

Roach challenges the probable cause supporting the warrant, the sufficiency of the evidence supporting each count of conviction, and the district court's decision to allow a detective to testify as a gang expert. Although we agree with Roach that the warrant for his girlfriend's residence lacked probable cause for two independent reasons, we conclude that the officers relied on and executed the warrant in good faith. Accordingly, we may not suppress the evidence obtained during the search. We also agree that the district court failed in its duty under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to make factual findings regarding the reliability of the detective's expert testimony, but we hold that this error was harmless. Lastly, we conclude that the evidence was sufficient to support each count of conviction. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

**I**

Roach was arrested after police executed a search warrant at his girlfriend's residence and found a firearm, ammunition, and 2.03 grams of crack cocaine. The search warrant for LaQuisha Hughes' apartment at 1441 N. Minneapolis Street,

Wichita, Kansas, was issued on April 30, 2007, based on a 120-page affidavit by Ron Goodwyn, a Sedgwick County Sheriff's Office narcotics officer assigned to work with the federal Drug Enforcement Administration and Gang Task Force.

**A**

As explained in its opening pages, the affidavit seeks to describe a drug trafficking conspiracy by members of the Crips gang as a basis to search the residences of Crips members. Describing the evidence supporting issuance of a warrant, the affidavit begins by summarizing general activities of the Crips street gang, then provides a list of thirty-three individuals "identified by the [Wichita Police Department ("WPD")] as members of the Wichita Crip street gang," including Roach. The affidavit then relays information given by three cooperating witnesses (all Crips members) about the criminal activities of, and associations among, these individuals. However, none of these cooperating individuals mentions Roach. The remaining 100 pages of the affidavit consist solely of summaries of a wide variety of incidents investigated by the WPD over a period of seventeen years involving various individuals identified as Crips members.

Roach's name is mentioned in connection with approximately twenty-five of the more than 500 listed incidents. The earliest of these occurred on September 24, 1993. The application documents Roach's activities between 1993 and 2002, including frequent possession of ammunition and handguns; admissions

in 1995 that he was a Crip and in 1996 that he was a "former" Crip; presence in residences that were shot at by members of other gangs, sustaining gun wounds on two occasions; presence at vehicle stops during which other individuals were arrested on outstanding warrants; attendance at Crip hangouts; participation in gang fights, including two in which he allegedly fired a weapon; possession of marijuana; arrest for driving with a suspended license after he was stopped under suspicion of participation in a drive-by shooting; and arrest in 2000 on an unspecified outstanding warrant.

In the recounting of the five years preceding issuance of the warrant, Roach's name is mentioned only four times: (1) noting his July 2005 arrest on a prior warrant for unspecified crimes; (2) describing a November 2005 traffic stop of Roach's vehicle during which an officer "talked to Roach about his gang activity" and Roach replied, "I understand, I choose to live this lifestyle and I have to deal with the repercussions;" (3) documenting a February 2006 domestic violence call which resulted in Roach's conviction on charges of criminal threat and violation of protective orders; and (4) noting that on June 28, 2006—ten months before issuance of the warrant—Roach was seen in the company of another Crip.

Based solely on these summaries, the affidavit concludes that there was probable cause to believe, in April 2007, that items related to drug trafficking by the Crips would be found at Roach's residence. An appendix to the affidavit lists

these items, including narcotics ledgers and other records related to drug distribution, United States currency, firearms, and gang-related clothing such as "University of North Carolina items, blue hats, blue jackets, blue bandanas, and blue shirts."

The affidavit also concludes that police had probable cause to believe that Roach resided at 1441 N. Minneapolis. The sole support for this conclusion is a generalized statement that "officers have verified that the individuals listed below live at the following addresses, through investigations, which included checking for utilities information, driver's license records, real estate records, Wichita Police Department records, tax records, social security records, US Postal Service records, interviews and/or surveillance."[1]

**B**

A United States Magistrate Judge issued a warrant, and police searched 1441 N. Minneapolis on May 1, 2007, just before 8:00 a.m.[2] Officers testified that a blue porch light was on outside the residence when they arrived. Roach, his

---

[1] The government notes that, at trial, police testified that they had conducted surveillance of the address before applying for the warrant and had seen Roach enter, apparently with a key. This fact is irrelevant to our determination regarding probable cause because it does not appear in the affidavit. United States v. Barrera, 843 F.2d 1576, 1581 (10th Cir. 1988).

[2] Because we must view all evidence in the light most favorable to the government, United States v. Kaufman, 546 F.3d 1242, 1263 (10th Cir. 2008) (jury verdict); United States v. Danhauer, 229 F.3d 1002, 1005 (10th Cir. 2000) (denial of motion to suppress), we present the facts that follow in that light.

girlfriend, and her young son were in bed in the northeast bedroom of the apartment when the search commenced. During the ensuing search of that bedroom, officers found a plastic bag of crack cocaine sitting atop a piece of paper and $108 in cash on a closet shelf. Officers described the paper as a time slip for hours worked the previous day, bearing the words "Burger King," the phrase "Hours This Week," and Roach's name.[3] On the end of the same shelf officers found a loaded 9-millimeter semiautomatic handgun. The closet also contained both men's and women's clothing, including a light blue hat. Elsewhere in the bedroom officers found an envelope from the City of Wichita Municipal Court addressed to Roach at another address; letters from Roach to Hughes, sent from and received at addresses other than 1441 N. Minneapolis; Roach's Kansas ID, also bearing a different address; his wallet; a bag of marijuana; and a package of Ziploc bags commonly used to package drugs. In other rooms of the apartment, officers found in plain view several sets of digital scales commonly used to weigh narcotics; a plate and razorblade; rubber gloves; more baggies; an empty 9-millimeter ammunition box; and some 9-millimeter and .380 ammunition in a carrier.

---

[3] This time slip was never entered into evidence because it was not preserved by police. A photo from the residence shows a crumpled piece of paper bearing the letters "MANUE" and the phrase "Hours This Week," but the words "Burger King" are not visible. However, several officers testified to their memory that the slip of paper had Roach's full name on it along with the words "Burger King."

Roach was arrested and later indicted on five counts: (1) possession of a firearm by a person previously convicted of a felony in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (2) possession of a firearm with an obliterated serial number in violation of §§ 922(k) and 924(a)(2); (3) possession with intent to distribute 2.03 grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1); (4) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); and (5) possession of ammunition by a person previously convicted of a felony in violation of §§ 922(g)(1) and 924(a)(2).

## C

After his indictment, Roach moved to suppress the evidence obtained during the search on the ground that the warrant authorizing the search was not supported by probable cause as required by the Fourth Amendment. U.S. Const. amend. IV. He argued that the affidavit did not provide probable cause to conclude either that he was an active member of the Crips or that he resided at 1441 N. Minneapolis. The district court denied the motion after a hearing.

In addition, Roach filed a motion in limine seeking to prevent the government from presenting a WPD detective, Jason Miller, as an expert witness on gang activity and asking the court to rule on Miller's expert credentials under Daubert, 509 U.S. 579. In response, the government filed Miller's resume with the court. The court held a hearing on this and other motions and Roach again raised the Daubert issue, but the court denied his motion in limine without ruling

on Miller's expert qualifications or reliability. The case went to trial in November 2007.

At trial, Detective Miller testified that he had fourteen years' experience with the WPD, including eight years as a detective. Both before and after he became a detective, he was assigned to the Gang Intelligence Unit and specifically to the Targeted Offenders Program. He identified a number of gang-related training programs and conferences that he had attended as an officer, some for multiple years, and explained that he instructed classes related to gangs both at conferences and for the WPD.

After Miller testified regarding his experience and training, and following Roach's renewed objection to Miller's testimony, the district court instructed the jury as follows:

> Well, as I've told you before the testimony of a witness expresses opinions concerning gangs and concerning drugs such as this one. Technical or other specialized knowledge may assist the jury in understanding the evidence and determining the facts in issue. A witness who has knowledge and experience or training and education may testify and state an opinion concerning such matters.

Later, the court added, "I've determined that the jury may consider him as an expert and give it such consideration as they deem appropriate."

Miller went on to give expert testimony about "the types of tools of the trade that people who are affiliated with gangs, specifically the Neighborhood Crips, carry or maintain," explaining that firearms are such a tool and are used to

protect drugs and to battle with other gangs. He also testified that gang members commonly use certain slang present in the letters from Roach to Hughes, including replacing the letters "ck" with the letters "cc." Finally, he told the jury that drug dealers often use colored lights to guide their customers, and that a blue bulb in particular indicates an association with the Crips, who identify with the color blue.

At the close of the government's evidence, Roach moved for judgment of acquittal under Federal Rule of Criminal Procedure 29. That motion was denied subject to reconsideration. Roach's parents testified that he was living with them at the time of the search and did not have a key to Hughes' residence. Because he did not have a car, his parents drove him to his shifts at Burger King where he was employed and, at times, to Hughes' apartment. His mother stated that Roach left the gang "a long time ago" and "wants to go on with his life." Roach's manager at Burger King testified that a Burger King time slip would not include the words "Burger King" but only the employee's information.

The government then called Hughes as a rebuttal witness. She testified that she had given Roach a key to her apartment, that he stayed there "quite frequently," and that he kept clothes there. She testified that she was unaware of a gun in her apartment until the search occurred, that she had not put the 9-millimeter handgun in the closet or the ammunition in her kitchen, that the baggie

of crack cocaine did not belong to her, and that no other adults had access to her home.

After deliberations, the jury found Roach guilty on all five counts. Roach renewed his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c)(1) and simultaneously moved for a new trial under Rule 33. These motions were denied, and Roach now appeals his conviction, arguing that the district court erred in (1) denying suppression, (2) denying his motion for judgment of acquittal based on insufficient evidence, and (3) admitting Miller's testimony.

## II

In reviewing the denial of a motion to suppress, we must view the evidence in the light most favorable to the government and uphold the district court's factual findings unless clearly erroneous. Danhauer, 229 F.3d at 1005. Because a magistrate's probable cause determination must be supported by facts presented in the affidavit, we limit our review to those facts. Id. at 1006; Barrera, 843 F.2d at 1581. "Determinations relating to the sufficiency of a search warrant and the applicability of the good-faith exception are conclusions of law . . . which this court reviews de novo." Danhauer, 229 F.3d at 1005. We afford great deference to a magistrate's finding of probable cause, reversing only if the affidavit supporting the warrant application provides "no substantial basis for concluding that probable cause existed." Id. at 1006 (quotation omitted).

**A**

In order to issue a search warrant, a magistrate must determine that probable cause supporting a search exists. "An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Soderstrand, 412 F.3d 1146, 1152 (10th Cir. 2005) (quotation omitted). The affidavit must show a "nexus between . . . suspected criminal activity and the place to be searched," United States v. Gonzalez, 399 F.3d 1225, 1228 (10th Cir. 2005) (quotation omitted), and a court may not "arrive at probable cause simply by piling hunch upon hunch," United States v. Valenzuela, 365 F.3d 892, 897 (10th Cir. 2004). "Searches conducted pursuant to a warrant are favored, and, as such, the magistrate's determination that probable cause exists is entitled to great deference." Gonzales, 399 F.3d at 1228 (citation omitted).

Roach argues that Officer Goodwyn's affidavit is insufficient in two respects: (1) it fails to establish probable cause because it relies on outdated and stale evidence of Roach's connection to the Crips; and (2) it fails to provide a nexus between Roach and 1441 N. Minneapolis. We agree in both respects.

**1**

"[P]robable cause to search cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched."

United States v. Mathis, 357 F.3d 1200, 1206-07 (10th Cir. 2004) (quotation omitted). "[W]hether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." Id. at 1207 (quotation omitted). As is only logical, "ongoing and continuous activity makes the passage of time less critical when judging the staleness of information upon which a search warrant is based," id. (quotation omitted), because evidence of a longstanding pattern of repeated activity makes it less likely that the activity has ceased within a short time frame.

The government relies on Mathis to support the constitutionality of the warrant for Hughes' residence. In that case, we held that information from four confidential informants indicating that a suspect was dealing drugs, which collectively spanned a period from two years before issuance of the warrant to less than two months before, was not so stale as to obviate probable cause. Id. at 1203, 1205-07. But the distinction from this case is obvious, and we conclude that Mathis in fact supports Roach's position: In Mathis, the gap between the last indication of drug dealing by the suspect and the search of his residence was less than two months. Id. at 1203, 1206 (stating that the most recent information was from "late January 2001" and the warrant was executed on March 9, 2001). Here, the most recent indication of gang-related criminal activity was some five years

before issuance of the warrant.[4]  Cf. United States v. Cortez-Galaviz, 495 F.3d 1203, 1209 (10th Cir. 2007) (evidence supporting reasonable suspicion was not stale after twenty days); United States v. Harris, 369 F.3d 1157, 1165-66 (10th Cir. 2004) (multi-year investigation of defendant's drug-related activities and discovery of drug-related items during several Terry stops could support a warrant issued one month after the last of these events).

The government argues that although the most recent evidence of gang-related criminal activity by Roach arose in 2002, Roach had admitted to police during a stop in 2005 that he lived a gang "lifestyle."  Roach's 2005 admission, we are told, "effectively corroborated or refreshed the allegedly stale information."  Harris, 369 F.3d at 1166 (quotation omitted).  We reject this argument.

Even if we agreed that evidence of Roach's gang membership in 2005 is equivalent to evidence that in 2007 he was probably involved in his 1993-2002 course of criminal conduct, his admission was itself nearly one and a half years old at the time of the warrant application.[5]  Cf. Mathis, 357 F.3d at 1203, 1205-07

---

[4] Roach's unspecified 2005 arrest and 2006 domestic violence arrest cannot be considered evidence of gang-related crimes.

[5]  The government argued below, but does not argue before us, that probable cause to believe that Roach remained a gang member could support a search of his residence.  We have explained that evidence of past gang membership, by itself, does not support even a reasonable suspicion of a crime:

(continued...)

(information about a continuing course of conduct was not stale when the most recent such information was less than two months old); Harris, 369 F.3d at 1165-66 (information about a continuing course of conduct was not stale when the most recent such information was one month old).  We recognize that "[t]he determination of whether information is stale depends on the nature of the crime and the length of criminal activity, not simply the number of days that have elapsed between the facts relied upon and the issuance of the warrant."  United States v. Basham, 268 F.3d 1199, 1206 (10th Cir. 2001).  But it would stretch this rule beyond its breaking point to conclude that an isolated statement, occurring one and a half years before issuance of the warrant, is evidence that a prior course of criminal conduct is ongoing.  See United States v. Prideaux-Wentz, 543 F.3d 954, 958-59 (7th Cir. 2008) (evidence of possession of child pornography that was at least four years old was too stale to support a warrant); United States v. Howard, 532 F.3d 755, 759 n.5 (8th Cir. 2008) ("[E]vidence of a one-and-a-half year old conviction, standing alone, might be considered stale."); United States v. Wright, 343 F.3d 849, 865 (6th Cir. 2003) ("[T]he information regarding the

<div style="border-top: 1px solid; width: 40%"></div>

[5](...continued)
Though officers knew of [a suspect's] past association with a gang, he had been on parole for two years with only one violation—missing curfew.  Presumably all parolees have criminal records, and if this were sufficient to warrant reasonable suspicion, there would effectively be no limits on the ability of law enforcement officers to conduct warrantless searches of parolees' homes.

United States v. Freeman, 479 F.3d 743, 749 (10th Cir. 2007).

- 14 -

medallion may have been stale because it was unlikely that Wright would have possession of such an item three years after the crime."); United States v. Zimmerman, 277 F.2d 426, 435-36 (3d Cir. 2002) (evidence that informants viewed child pornography at a suspect's house six months earlier was too stale to support a warrant). This is particularly so considering that firearm and drug trafficking are not the sorts of crimes whose evidence is likely to remain stationary for years at a time. Cf. United States v. Perrine, 518 F.3d 1196, 1206 (10th Cir. 2008) (explaining that child pornography is particularly likely to remain in the owner's possession for long periods of time); United States v. Zayas-Diaz, 95 F.3d 105, 116 (1st Cir. 1996) (citing cases concluding that evidence of drug trafficking may remain in one place for weeks or months at a time).

In light of the extreme age of the evidence of Roach's involvement in gang crimes, we conclude that the warrant did not set forth probable cause to search 1441 N. Minneapolis. We turn to the additional question of whether it set forth a sufficient basis to believe that he resided at the searched premises.

**2**

"Probable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime. Instead, there must be additional evidence linking the person's home to the suspected criminal activity."

- 15 -

United States v. Rowland, 145 F.3d 1194, 1204 (10th Cir. 1998); see also United States v. Biglow, 562 F.3d 1272, 1278-79 (10th Cir. 2009). Roach contends that the search warrant did not provide the requisite "nexus between the contraband to be seized or suspected criminal activity and the place to be searched," Gonzales, 399 F.3d at 1228 (quotation and alteration omitted), because it did not articulate facts supporting probable cause to believe that he resided at 1441 N. Minneapolis. As recounted above, the only connection provided between Roach and the premises was the following general statement applicable to all fifteen residences identified in the affidavit: "[O]fficers have verified that the individuals listed below live at the following addresses, through investigations, which included checking for utilities information, driver's license records, real estate records, Wichita Police Department records, tax records, social security records, US Postal Service records, interviews and/or surveillance."

Of course, the difficulty with this statement is not that the methods described, if each and every one were successfully used to link Roach to 1441 N. Minneapolis, would be insufficient. Rather, it is that the statement as phrased does not reveal which of these methods was, in fact, used by police to connect Roach to the premises. Because it states only that investigations into all fifteen residences "included" the listed methods, the sentence asserts merely that at least one of these methods was used for each of the fifteen residences on the list. A magistrate reading the statement would not, from the face of the affidavit, know

which of the listed methods was used to verify that Roach resided at 1441 N. Minneapolis.  A magistrate, therefore, would be wholly unable to determine independently whether the method employed to verify Roach's residency succeeded in doing so.  That proves fatal to a probable cause determination. There is simply not enough evidence on the face of the affidavit for a magistrate to conclude reasonably that the requisite nexus between Roach and 1441 N. Minneapolis was present.  See Gonzales, 399 F.3d at 1228.

Nor would the magistrate have been justified in relying upon the blanket assertion that "officers have verified that the individuals listed below live at the following addresses," as this would fly in the face of the probable cause requirement.  It has long been established that a warrant must be supported by facts demonstrating probable cause, not by police summaries of what they have concluded from such facts.  Illinois v. Gates, 462 U.S. 213, 239 (1983) (holding that "mere conclusory statement[s]" cannot support probable cause).  Because the affidavit failed to provide a sufficient nexus between Roach and the premises at 1441 N. Minneapolis, we conclude that the warrant lacked probable cause on this basis as well.

**B**

Notwithstanding a lack of probable cause to support a warrant, we must refuse the suppression remedy if the officers executing the warrant relied in good faith upon the magistrate's authorization.  United States v. Leon, 468 U.S. 897,

922 (1984).  "The law encourages, generally demands, officers obtain a warrant

before conducting a search, especially of a home[, and] [c]ourts reward officers

who obtain warrants."  Poolaw v. Marcantel, 565 F.3d 721, 747 (10th Cir. 2009).

Nonetheless, a faulty warrant requires suppression in four situations:

> First, evidence should be suppressed if the issuing magistrate was
> misled by an affidavit containing false information or information
> that the affiant would have known was false if not for his reckless
> disregard of the truth.  Second, the [good-faith] exception does not
> apply when the issuing magistrate wholly abandons her judicial role.
> Third, the good-faith exception does not apply when the affidavit in
> support of the warrant is so lacking in indicia of probable cause as to
> render official belief in its existence entirely unreasonable.  Fourth,
> the exception does not apply when a warrant is so facially deficient
> that the executing officer could not reasonably believe it was valid.

Danhauer, 229 F.3d at 1007 (quotation and alteration omitted).  Only the third is

implicated here.[6]

When considering the reasonableness of officers' belief that probable cause

existed, we have explained:

> While officers are generally entitled to rely on the magistrate's
> judgment, they are also required to exercise their own professional

---

[6] Roach also argues that the first category applies because Roach's
connection to 1441 N. Minneapolis was an "unsubstantiated assertion[]."  But
Roach's only support for this argument is his statement that "[i]f Law
enforcement had specific utility bills, mailings or other documents linking Mr.
Roach to [1441 N.] Minneapolis[,] nothing stopped them from specifically
identifying them in the Affidavit."  This statement is certainly true, but it does not
support an inference that officers mislead the magistrate.  Moreover, Roach did
not argue in the district court that the affiant recklessly or intentionally misled the
magistrate when he presented the list of methods used to confirm residence at the
various addresses.  Nor did Roach seek a hearing under Franks v. Delaware, 438
U.S. 154 (1978), to prove that the affidavit was in any way false.

judgment. Indeed, law enforcement officials are presumed to have a reasonable knowledge of the law, and we determine good faith in this context by considering whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.

Gonzales, 399 F.3d at 1230 (quotations omitted). "Under this standard, when the underlying documents are devoid of factual support, an officer cannot be said to have relied on them in good faith." Id. "[T]he government, not the defendant, bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable." United States v. Cook, 854 F.2d 371, 373 (10th Cir. 1988) (quotation omitted).

**1**

Turning first to the staleness of the information in the warrant, we note that although the information was quite old, Roach's past course of criminal conduct was unusually long. Our case law indicates that when criminal conduct is ongoing, staleness is partly dependent on the length of that conduct. Mathis, 357 F.3d at 1207. Considering the dearth of cases in our circuit holding that particular information was so stale as to vitiate probable cause, an officer with reasonable knowledge of the law might have concluded, until today, that Roach's decade-long involvement in gang-related crimes logically meant that he would continue to be involved in such crimes and to retain evidence of them at his residence. Moreover, the affidavit demonstrated that many of his past associates continued to be involved in such crimes, which adds at least some weight to such

a conclusion.  Cf. United States v. Harris, 20 F.3d 445, 451 (11th Cir. 1994) (relying on defendant's continuing relationships with coconspirators as support for conclusion that information in affidavit was not stale).  We conclude that the officers' reliance was in good faith despite the staleness of the evidence.

**2**

As to the connection between Roach and 1441 N. Minneapolis, we have held that good faith can be established so long as a "minimal nexus" exists between the place to be searched and the suspected criminal activity.  Gonzales, 399 F.3d at 1231.  In Gonzales, such a nexus was lacking because the warrant application "was not supported by any facts establishing the residence belonged to or was otherwise linked to Mr. Gonzales."  Id.  Here, the affidavit explicitly stated that 1441 N. Minneapolis was Roach's residence and that officers had confirmed as much.  Moreover, the language of the affidavit indicates that officers did so using at least one of a list of investigatory methods, any one of which would—assuming they were successful—provide a "minimal nexus" connecting Roach to the address.  It would not be entirely unreasonable, therefore, for officers executing the warrant to rely on the magistrate's authorization of it.  It is not a "bare bones" affidavit of the sort disapproved in Leon.  See United States v. McPhearson, 469 F.3d 518, 526 (6th Cir. 2006) ("A bare bones affidavit is one that merely states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity,

reliability, and basis of knowledge." (quotation omitted)). We accordingly uphold the district court's denial of suppression.

**III**

We review the sufficiency of the evidence de novo, "asking only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." Kaufman, 546 F.3d at 1263 (quotation and alteration omitted).

**A**

Each of Roach's crimes of conviction has possession as an element. See 18 U.S.C. §§ 922(g)(1), 922(k), 924(c)(1)(A)(i); 21 U.S.C. § 841(a)(1). Roach first contends that there is insufficient evidence of his possession of the gun, ammunition, and crack cocaine.

Possession of contraband may be either actual or constructive. United States v. Reece, 86 F.3d 994, 996 (10th Cir. 1996). Constructive possession exists when a person "knowingly holds the power and ability to exercise dominion and control over" an object. United States v. Lopez, 372 F.3d 1207, 1211 (10th Cir. 2004) (quotation and alteration omitted). When contraband may be attributed to more than one person, as in a case of joint occupancy of a premises, the government must show "some nexus, link, or other connection between the defendant and the contraband" beyond mere co-occupancy of the

premises. <u>Reece</u>, 86 F.3d at 996. That nexus cannot be based on proximity alone, and requires either direct or circumstantial evidence that the defendant had knowledge of, and access to, the contraband. <u>United States v. Jameson</u>, 478 F.3d 1204, 1209-10 (10th Cir. 2007).

The government stresses the considerable evidence that Roach co-occupied the premises with Hughes, but that of course is not enough. The additional evidence that Roach had knowledge of and access to the gun, ammunition, and bag of crack cocaine consists of, among other things: (1) officers' testimony that there was men's clothing on the floor of the bedroom closet, which the jury could infer belonged to Roach; (2) Hughes' testimony that she was not aware of the gun or crack cocaine in the closet, that she did not own either item, that she did not put the ammunition in the kitchen, and that no other adults had access to the apartment; (3) testimony that Roach had a key to the premises, suggesting that he regularly stayed there; (4) the Burger King time slip belonging to Roach on the same closet shelf as the firearm and baggie, which officers testified had his name on it and visibly included the letters "MANUE" in photographs submitted to the jury; and (5) testimony that the ammunition in the kitchen was in plain view, located near some digital scales and other drug-related items.

A reasonable jury could conclude based on this evidence that Roach had knowledge of and access to the gun, ammunition, and crack cocaine. It would be reasonable to infer from the Burger King slip and the presence of men's

clothing—combined with the inference that no other men lived in the apartment—that Roach had access to the closet and specifically to the top shelf, and that he would have seen the crack cocaine and the gun when he accessed his clothing or placed the time slip on the top shelf. Moreover, the jury was permitted to credit Hughes' testimony that only she and Roach had access to the apartment and that she had not placed the gun or the crack cocaine in the closet, leaving a reasonable inference that Roach had done so. A jury could also infer that because Roach regularly stayed at the residence he had knowledge of and access to the ammunition in plain view in the kitchen, some of which corresponds to the type of firearm found in the closet (9-millimeter). This evidence, although admittedly circumstantial, was sufficient viewed as a whole to provide the requisite "nexus" to show that Roach was in constructive possession of the gun, the ammunition, and the drugs. See Jameson, 478 F.3d at 1208-10; see also United States v. Poe, 556 F.3d 1113, 1125-26 (10th Cir. 2009).

**B**

Roach launches an additional though ultimately unsuccessful attack on his conviction for possession of crack cocaine with intent to distribute, 21 U.S.C. § 841(a)(1). He asserts that there was insufficient evidence of such intent. However, a reasonable jury could infer intent to distribute from the package of Ziploc bags, the sets of digital scales, the rubber gloves, and the firearm and ammunition. "Our cases recognize that [these] items are commonly regarded as

tools of the drug trade. . . . All of this evidence suggests [that Roach] was engaged in the distribution of illegal drugs." United States v. Winder, 557 F.3d 1129, 1138 (10th Cir. 2009) (citations omitted); see also Poe, 556 F.3d at 1126. Accordingly, we hold that there was sufficient evidence to support each of his crimes of conviction.

## IV

Federal Rule of Evidence 702 requires courts to assess the reliability of expert testimony based on scientific, technical, or "other specialized" knowledge before admitting it. Daubert, 509 U.S. at 589; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (extending the Daubert gatekeeping requirement to "technical" and "other specialized" knowledge). Roach argues that the district court failed to perform this assessment as to Detective Miller's testimony.

"[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire Co., 526 U.S. at 142. Thus, a district court may satisfy its so-called "gatekeeping" function by ruling on a Rule 702 objection at trial, "so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1087 (10th Cir. 2000) (quoting Daubert, 509 U.S. at 597). Although "the

gatekeeper inquiry under Rule 702 is ultimately a flexible determination, . . . a district court, when faced with a party's objection, must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." Goebel, 215 F.3d at 1088 (citation omitted). "[W]e review de novo the question of whether the district court applied the proper standard and actually performed its gatekeeper role in the first instance. We then review the trial court's actual application of the standard in deciding whether to admit or exclude an expert's testimony for abuse of discretion." Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003).

## A

We have allowed police to testify as experts under Rule 702 on many occasions. E.g., United States v. Quintana, 70 F.3d 1167, 1170-71 (10th Cir. 1995) (upholding admission of police detective's testimony explaining terminology used by drug traffickers); United States v. Sturmoski, 971 F.2d 452, 459 (10th Cir. 1992) (upholding admission of agent's testimony about the value of methamphetamine labs and the use of firearms to protect the investment therein); United States v. McDonald, 933 F.2d 1519, 1520-23 (10th Cir. 1991) (upholding admission of police detective's testimony about pricing, packaging, use of firearms, and other features of street cocaine sales). Other circuits have similarly allowed expert police testimony on street gangs' use of slang, signifying colors, and other indicia of membership or activity. E.g., United States v.

Hankey, 203 F.3d 1160, 1167-71 (9th Cir. 2000) (upholding admission of police expert testimony on gang colors, signs, and activities); see also United States v. Locascio, 6 F.3d 924, 936-37 (2d Cir. 1993) (upholding admission of FBI Agent's testimony on "the structure of organized crime families"). Roach does not argue that Miller's testimony lacked specialized knowledge or that it was irrelevant.

Nevertheless, before admitting expert testimony, the district court is required to make specific, on-the-record findings that the testimony is reliable under Daubert. Goebel, 215 F.3d at 1088; see also United States v. Cui Qin Zhang, 458 F.3d 1126, 1129 (10th Cir. 2006). It is this requirement that Roach argues was not met. We agree.

As discussed above, the district court chose not to conduct a Daubert hearing before trial, deferring the issue to be decided after objection. When defense counsel made such an objection, the court responded by explaining Rule 702 to the jury, then stating that "I've determined that the jury may consider [Miller] as an expert and give [his expert testimony] such consideration as they deem appropriate." These statements simply do not include any factual findings indicating the basis of the court's determination that Miller met the requirements of Rule 702. A conclusory statement that the court has made such a determination will not suffice. See Goebel, 215 F.3d at 1088. "Without specific findings or discussion on the record, it is impossible on appeal to determine whether the district court carefully and meticulously reviewed the proffered

scientific evidence or simply made an off-the-cuff decision to admit the expert testimony." Id. (quotation omitted). Accordingly, the court erroneously admitted Officer Miller's testimony without the required findings of reliability.

**B**

As with any erroneous admission of evidence, however, we will reverse a resulting conviction only if the court's error was not harmless—that is, if "it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." United States v. Bornfield, 145 F.3d 1123, 1131 (10th Cir. 1998) (quotation omitted); see Fed. R. Crim. P. 52(a).

> [We] examine the entire record, focusing particularly on the erroneously admitted statements. The question is not whether, omitting the inadmissible statements, the record contains sufficient evidence for a jury to convict the defendant. Rather, we must discern whether the statements, in light of the whole record, substantially influenced the outcome of the trial, or whether we are left in grave doubt as to whether it had such an effect. If our answer to either of these questions is yes, the error requires reversal.

United States v. Tome, 61 F.3d 1446, 1455 (10th Cir. 1995) (quotation omitted); accord Goebel, 215 F.3d at 1089 ("Erroneous admission of evidence is harmless only if other competent evidence is sufficiently strong to permit the conclusion that the improper evidence had no effect on the decision." (quotation omitted)).[7]

---

[7] We stress that in determining harmlessness, the issue before us is not whether the district court could have made the finding that Miller was qualified as an expert based on the evidence in the record. Under Daubert, that determination is strictly reserved for the district court.

- 27 -

"The government has the burden of proving that the non-constitutional error was harmless." Tome, 61 F.3d at 1455 (quotation omitted).

We conclude that the government has met its burden of showing that Miller's testimony did not substantially affect the verdict and we are not left in grave doubt as to whether it had such an effect. The key question, as described above, was whether Roach possessed the gun, ammunition, and crack cocaine found in Hughes' apartment. The thrust of Miller's testimony was to support an inference that Roach was a member of the Crips, which might have influenced the likelihood that the jury would find Roach guilty even if they discredited testimony from Hughes or police that circumstantially indicated that he possessed the items. But even excluding Miller's testimony, the record contains other evidence of Roach's gang membership. Each of his parents and his former supervision officer from his time in prison testified that he had belonged to a gang in the past. Roach's mother stated that blue clothing indicated Crips membership, as did a testifying officer, and testimony from officers other than Miller mentioned the blue porch light and blue clothing found in the closet. Other officers indicated that the drug paraphernalia found in Hughes' residence was of a sort that would be used by a "criminal narcotics enterprise" rather than merely an individual user.

Because the jury could have drawn the inference that Roach was a gang member without Miller's testimony, the possibility that the jury would use that

inference to support a guilty verdict existed even without Miller's testimony. Thus, we conclude that the district court's error in failing to make the findings required by <u>Daubert</u> before admitting Miller's testimony was harmless and need not result in reversal of Roach's conviction.

**V**

**AFFIRMED**.